Argued and submitted September 14, 1984, affirmed in part, reversed in part June 5, Perfected Pets' reconsideration and Thayer's reconsideration denied July 26, both petitions for review denied August 8, 1985 (299 Or 584)

SEASE et al,
*Plaintiffs,*

*v.*

TAYLOR'S PETS, INC. et al,
*Defendants.*

(A8107-04299; CA A29230 (control))

THAYER et al,
*Respondents,*

*v.*

PERFECTED PETS, INC. et al,
*Appellants.*

(A8107-04440; CA A29416)
(Cases consolidated)
700 P2d 1054

Richard L. Grant, Buell, Black & Dupuy, Portland, filed the brief for appellants Taylor's Pets, Inc., and Robert and Joan Taylor.

Patrick N. Rothwell, Portland, argued the cause for appellant Perfected Pets, Inc. With him on the briefs was Hallmark, Griffith & Keating, P. C., Portland.

Donald A. Greig, Portland, argued the cause for respondents. With him on the brief was McClaskey & Greig, Portland.

Before Joseph, Chief Judge, and Warden and Newman, Judges.

NEWMAN, J.

## NEWMAN, J.

Defendants appeal judgments of $20,000 each for plaintiffs Nora Thayer, Paula Hill and Bradford Hill in a products liability action.[1] Plaintiffs' actions had been consolidated for trial with a separate action of Shirley Sease, Janice Sease and Betty Nelson, who also obtained judgments against defendants but who settled pending appeal.

From the evidence the jury could have found these facts. On June 21, 1979, Janice bought a pet skunk from defendant Perfected Pets, Inc., a pet shop in Portland. It had purchased the skunk earlier in June from defendants Taylor's Pets, Inc., and Robert and Joan Taylor (Taylor's Pets), who had raised it on their Minnesota pet farm. Janice kept the skunk in her house and occasionally took it to the homes of the other plaintiffs. Nine or ten days after Janice bought it, it began to attack and bite people, lose fur and develop sores on its body. It bit Paula. Although it did not bite Nora, she handled it, fed it and came into contact with its saliva. The skunk also did not bite Paula's 16-year-old brother, Brad, but he came in contact with the skunk's saliva, because he handled the skunk at a time when he had open cuts and scratches on his arms from cutting blackberry bushes. Moreover, during play, the skunk had licked Brad several times with its tongue and also had stuck its nose in Brad's mouth. The skunk bit Janice and Shirley, and Betty came in contact with its saliva.

Janice and Paula took the skunk back to Perfected Pets. Janice asked if she was caring for the animal properly. Perfected Pets advised Janice to change the skunk's diet and she took it home again. The new diet had no effect, however, and the skunk died nine or ten days later. Janice took it to a veterinarian for an autopsy. Both the Oregon State Health Division and the Washington State Health Department confirmed that it was rabid. Dr. Williams of the Oregon State Health Division testified that the skunk had probably been in the incubation stage of rabies when it had left the pet farm in Minnesota.

Until recently, prophylactic rabies treatments consisted of 21 daily injections of duck embryo vaccine with

---

[1] Defendant Milbank Mutual Insurance Company is not a party to this appeal. The judgments below did not dispose of the claims against it, but the trial court complied with ORCP 67B.

boosters.[2] Injections ordinarily were made in the abdomen. The shots could cause intense pain at the site of the injection, nausea, headaches, muscle aches and mild temperature elevations. Occasionally the shots caused anaphylactic shock and neuroparalytic accidents. If a person were infected with rabies and did not undergo treatment, death was almost certain. The vaccine, however, did not always prevent rabies.

A doctor from the Oregon State Health Division ordered rabies treatments for Nora and Paula and others whom the skunk had bitten or who had been exposed to its saliva. Because of his history of allergies, Brad's family physician concluded that the injections could cause anaphylactic shock and death and advised against them. He did not take the injections.

Nora experienced severe reactions to the vaccine. She suffered welts and bruises at the site of the injections. She received injections on top of welts and bruises from earlier injections. During the course of the treatment she experienced constant nausea and vomiting, lost between 20 and 25 pounds, could not watch television and could not drive a car because of motion sickness from the treatments. She had medical costs and lost wages totaling $1,006.20. Paula experienced nausea, soreness, irritability and pain connected with welts at the site of the injections. She had medical costs of $325.90. Both Paula and Nora were aware that their lives were endangered even after taking the treatments. Paula became withdrawn and reclusive because of worry.

Brad worried because he could not take the shots. He had to stay under the constant observation of his family. He testified that his anxiety caused him to lose sleep, but it did not limit his physical activities or cause him to lose wages or incur medical expenses.[3] None of the plaintiffs contracted rabies.

---

[2] Dr. Williams testified that an improved "human diploid cell strain" vaccine has been available since mid-1980 and that the new vaccine is more effective, has few side effects and has a very low reaction rate.

[3] Brad testified:

"A. I was quite startled and worried, you know, how you are kind of taken aback by things sometimes. Well, it worried me, and you really wondered what you are going to do. What would — would I gamble taking the shots or shouldn't I? At

Nora, Paula and Brad's complaint was based on strict products liability. ORS 30.920.[4] It did not allege breach of warranty or that any defendant engaged in intentional or negligent misconduct. Shirley, Janice and Betty's complaint alleged breach of warranty in addition to strict liability.

Throughout the trial, defendants often raised identical objections, and the trial court considered motions and objections stated by counsel for Perfected Pets to have been stated as well for Taylor's Pets. On appeal, however, Perfected Pets and Taylor's Pets submitted separate briefs. They raise six common assignments of error, and we also consider four other assignments of Perfected Pets. Three of the common

---

first I was a little upset. I didn't feel real great, physically, and everything, but that really — it didn't last for a very long time.

"Q. When you say you didn't feel good physically, what physical symptoms did you have?

"A. Oh like you find out something bad that just happened, you get this frog in your stomach or throat or churning, acidic feeling. I was rather tense. That's about all I can recollect immediately.

"But sometimes when I was thinking about it, I would lose some sleep, just, you know, wondering what was going to go on."

[4] ORS 30.920 provides:

"(1) One who sells or leases any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm or damage to property caused by that condition, if:

"(a) The seller or lessor is engaged in the business of selling or leasing such a product; and

"(b) The product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold or leased.

"(2) The rule stated in subsection (1) of this section shall apply, even though:

"(a) The seller or lessor has exercised all possible care in the preparation and sale or lease of the product; and

"(b) The user, consumer or injured party has not purchased or leased the product from or entered into any contractual relations with the seller or lessor.

"(3) It is the intent of the Legislative Assembly that the rule stated in subsections (1) and (2) of this section shall be construed in accordance with the Restatement (Second) of Torts sec. 402A, Comments a to m (1965). All references in these comments to sale, sell, selling or seller shall be construed to include lease, leases, leasing and lessor.

"(4) Nothing in this section shall be construed to limit the rights and liabilities of sellers and lessors under principles of common law negligence or under ORS chapter 72."

assignments of error are directed at all of the plaintiffs. Defendants assert that a live animal is not a "product" and that the court, therefore, erred when it denied motions for a directed verdict at the close of plaintiffs' case and at the close of all the evidence and motions for judgment notwithstanding the verdict. These assignments are the only ones that Taylor's Pets asserts against Nora and Paula. Accordingly, if the skunk is a "product," Taylor's Pets' appeal against Paula and Nora fails.

All of the remaining assignments relate to whether one or more of plaintiffs may recover damages for some aspect of the emotional distress that they suffered. Three are common assignments of error, concern only Brad and assert that because he suffered no "physical harm" he may not recover for emotional distress and that the trial court erred, therefore, when it denied motions for a directed verdict at the close of Brad's case and at the close of all the evidence and for judgment notwithstanding the verdict.

Perfected Pets' four separate assignments are that the court erred when it failed to give two requested jury instructions respecting plaintiffs' claims of emotional distress, failed to strike plaintiffs' "allegations" of emotional distress "relating to the fear of death" and denied its pretrial motion to dismiss Brad's claim because it asserts that he only alleged that he suffered "emotional distress" damages.

We turn first to the issue of whether a live animal is a "product" under ORS 30.900 *et seq.* It is a question of first impression in Oregon. In Illinois, live animals are not products within products liability law. In *Anderson v. Farmers Hybrid Co., Inc.,* 87 Ill App 3d 493, 42 Ill Dec 485, 408 NE2d 1194, 1199 (1980), the defendants sold diseased pigs, which subsequently infected and caused the death of several other pigs in the buyer's lot. The court stated:

> "[T]he changeable nature and health of living creatures, and the potential effect of events and conditions outside the control of the seller on such creatures, lead us to conclude that the trial court was correct in finding that the gilts at issue in this case are not products for purposes of imposing strict liability in tort under Section 402A. While a 'product' may be unchanged from its natural state, viable, and not the result of manufacturing processes, it must also be of a fixed nature at

the time it leaves the seller's control. * * * Living creatures, such as the swine in the instant case, are by their nature in a constant process of internal development and growth and they are also participants in a constant interaction with the environment around them as part of their development. Thus, living creatures have no fixed nature in the same sense as the blood or the mushrooms can be said to have a fixed nature at the time they enter the stream of commerce."

*See also Whitmer v. Schneble,* 29 Ill App 3rd 659, 331 NE2d 115 (1975).

New York, however, has held that a claim can be stated for strict liability for the sale of diseased hamsters. *Beyer v. Aquarium Supply Co.,* 94 Misc 2d 336, 404 NYS2d 778 (NY Sup Ct 1977). Although *Beyer* does not address the argument in *Anderson v. Farmers Hybrid Co., supra,* that living creatures do not have a fixed nature at the time they enter the stream of commerce, the court stated:

"[T]here is no reason why a breeder, distributor or vendor who places a diseased animal in the stream of commerce should be less accountable for his actions than one who markets a defective manufactured product. The risk presented to human well-being by a diseased animal is as great and probably greater than that created by a defective manufactured product and in many instances, for the average consumer, a disease in an animal can be as difficult to detect as a defect in a manufactured product." 404 NYS2d at 779.

Defendants urge that the Illinois cases are the more persuasive. They also assert that the reference in ORS 30.910 to a "product as manufactured and sold or leased" shows that the legislature intended "products" to include only manufactured or processed products, not live animals. ORS 30.920(3), however, expresses the legislature's intent that ORS 30.920 "shall be construed in accordance with the Restatement (Second) of Torts, sec. 402A, Comments a to m (1965)." *Comment e* makes clear that a "product" need not be manufactured or processed:

"Normally the rules stated in this Section [402A] will be applied to articles which already have undergone some processing before sale, since there is today little in the way of consumer products which will reach the consumer without such processing. The rule is not, however, so limited, and the supplier of poisonous mushrooms which are neither cooked,

canned, packaged, nor otherwise treated is subject to the liability here stated."

■ We also do not accept the reasoning of the Illinois cases that live animals may not be deemed products because of their mutability.[5] ORS 30.900 *et seq* cover products that are subject to both natural change and intentional alteration. ORS 30.915 and 30.920(1)(b) provide a defense to the seller or manufacturer that the product is not substantially "in the condition in which it was sold or leased." We hold that the live skunk which Janice purchased was a product within the meaning of ORS 30.900 *et seq.*[6] Accordingly, we affirm Nora and Paula's judgment on the appeal of Taylor's Pets.

■ As to the right to recover for emotional distress in a strict products liability action,[7] ORS 30.920 provides:

> "One who sells or leases any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for *physical harm* or damage to property caused by that condition * * *." ORS 30.920(1). (Emphasis supplied.)

Defendants concede that Nora, whom the rabid skunk bit, and Paula, who was also in contact with the skunk's saliva, did suffer "physical harm," because they received the rabies injections. Defendants argue, however, that Brad did not

---

[5] Both the Illinois and New York cases are extensively reviewed in "The Applicability of Strict Products Liability to Sales of Live Animals," 67 Iowa Law Review 803 (1982). The author criticizes the categorical exclusion of animals from products liability law in Illinois as an "inappropriate justification for a definitional exclusion" based on "misapplication of the mutational limitation and inadequate accommodation of policy." 67 Iowa Law Review at 814.

[6] Defendant argues that the definition of "product" in the Model Uniform Products Liability Act also excludes live animals:

> "(c) Product. 'Product' means any object possessing intrinsic value, capable of delivery either as an assembled whole or as a component part or parts and produced for introduction into trade or commerce."

Even if the Model Act should be given weight in the interpretation of ORS 30.900 *et seq*, we do not believe that its reference to products deliverable as "an assembled whole" means that the model act covers only products that are capable of being assembled. The central part of the definition is that a product is "any object possessing intrinsic value * * * produced for introduction into trade or commerce."

[7] Plaintiffs' complaint does not allege that defendants were negligent. *See Meyer v. 4-D Insulation Co.,* 60 Or App 70, 652 P2d 852 (1982), and *Nearing v. Weaver,* 295 Or 702, 670 P2d 137 (1983), which stand for the proposition that in negligence cases recovery of damages for mental distress absent physical injury is allowed where there is an "independent basis of liability * * *." 60 Or at 73.

suffer physical harm, because he did not take the injections and did not suffer illness or death from contact with the skunk's saliva. They argue that the evidence shows only that he suffered anxiety because he knew that he might develop rabies. They assert that the court should have directed a verdict against Brad and should have granted a judgment notwithstanding the verdict, because he suffered no "physical harm." We agree.

In contrast to ORS 30.920, ORS 30.900 defines "product liability civil action" as an action "for *personal injury,* death or property damage * * *." (Emphasis supplied.) *See also* ORS 30.905(2); 30.915(2). The parties do not discuss the significance of the difference in language between those sections and ORS 30.920, which speaks of "physical harm." ORS 30.900 covers actions based on negligence as well as strict liability, *see Marinelli v. Ford Motor Co.,* 72 Or App 268, 696 P2d 1 (1985), including those arising out of failure to warn or instruct as to use, as well as out of a defect in the product. *See* ORS 30.900(2) and (3). Moreover, the 1979 Legislature adopted ORS 30.920 two years after adopting ORS 30.900 - 30.915. ORS 30.920 applies to strict liability claims if a person sells or leases a product in a defective condition.

ORS 30.920 appears to state that plaintiffs may not recover for emotional distress unless they establish that they suffered physical harm. Although we have found no Oregon authority on the point, that position is in accordance with decisions from other jurisdictions interpreting *Restatement (Second) of Torts,* § 402A (1965), upon which ORS 30.920 is based.

Although we reject the Illinois rule that a live animal is not a product, we find helpful two cases from Illinois bearing on the recovery of damages for emotional distress in an action for strict products liability. In *Woodill v. Parke Davis & Co.,* 58 Ill App3d 349, 15 Ill Dec 900, 374 NE2d 683 (1978), *aff'd* 79 Ill 2d 26, 37 Ill Dec 304, 402 NE2d 194 (1980), the plaintiffs sought damages based on strict products liability for injuries to their son, and for their emotional distress because of his injuries, which they alleged resulted from the administration of a prescription drug to the mother while she was pregnant. The Appellate Court affirmed the dismissal of the count for plaintiffs' emotional distress, stating:

"[W]e do not believe that strict liability should be extended to include recovery for emotional distress and mental anguish to the parents of a minor who had suffered injury. First, because section 402A of the Restatement expressly limits recovery to physical harm. That section is entitled 'Special Liability of Seller of Product for *Physical Harm* to User or Consumer' (emphasis added), and it provides that '[o]ne who sells any product in a defective condition unreasonably dangerous to user or consumer or to his property is subject to liability for *physical harm* thereby caused to the ultimate user or consumer * * *' (emphasis added). Given the limitation underlined above in section 402A, we conclude that the Restatement did not intend a strict liability action for mental anguish or emotional distress. Furthermore, at present, Illinois recognizes no such action. Case law here allows a cause of action only for severe emotional distress caused by intentional conduct." 374 NE2d at 688.[8]

Plaintiffs argue that Illinois' failure to extend recovery for emotional distress beyond the realm of intentional torts should take away any persuasive effect that *Woodill* may have. We disagree. Although Oregon has allowed recovery for emotional distress in negligence cases in which Illinois may not allow it, neither state has extended recovery for emotional distress to cases in which the plaintiff does not allege either negligence, intentional injury or breach of warranty.

In *Mink v. University of Chicago*, 460 F Supp 713 (ND Ill 1978), the court relied on section 402A as stating the law of Illinois. It held that women who had been subjected to an increased risk of cancer by administration of DES without their knowledge had failed to state a claim for strict products liability:

"[O]ne of the essential elements in a claim for strict liability is physical injury to the plaintiff. The closest the complaint comes to alleging physical injury is the allegation of a 'risk' of cancer. The mere fact of a risk without any accompanying physical injury is insufficient to state a claim

[8] The affirming opinion of the Illinois Supreme Court deals principally with the question of whether "in an action seeking to hold a defendant strictly liable for failure to warn of a danger attendant to the use of a product, the plaintiff must allege and prove that the defendant knew or should have known of the danger." 402 NE2d at 195-96. It remanded to allow the plaintiffs to amend their complaint. The opinion, however, also adopts the ruling of the Appellate Court on the question whether strict liability should "be extended to include recovery for the plaintiffs' emotional distress and mental anguish." 402 NE2d at 200.

for strict products liability. *Rheingold v. E. R. Squibb & Sons,* 74 Civ. 3420 (SD NY 1975). Likewise, the plaintiffs may not rely on injury to their children to state a claim for relief for themselves, even though they allege mental anxiety and emotional distress as a consequence of the injury to their children." 460 F Supp at 719.

Here, Brad's exposure to and contact with the rabid skunk increased the risk that he would suffer physical harm.[9] He did not, however, suffer physical harm. Accordingly, we reverse the judgment for Brad Hill.

■ We now turn to the separate assignments of error of Perfected Pets. Because we have already determined Brad's appeal, we will respond only to the assignments of error that relate to Nora and Paula.[10] Perfected Pets argues that the court erred when it did not "strike the allegations of emotional distress relating to the fear of death" in the pleadings and the evidence. Plaintiffs' complaint, however, does not make such an allegation but asserts that each of plaintiffs suffered "pain and suffering, including mental pain and suffering." There is nothing for the court to strike. Perfected Pets also argues that the evidence showed that the emotional distress that Nora and Paula suffered did not result from the rabies injections and, therefore, did not result from the "physical harm" that they suffered. The jury could have found that Paula's fear of death resulted from the physical harm of being bitten. The jury could also have found that Nora's fear of death resulted in significant part from the trauma of the injections, which Perfected Pets acknowledges constituted "physical harm." The trial court properly denied the motion to strike the allegations of emotional distress relating to the fear of death.

■ ■ Perfected Pets also assigns as error that the court failed to give this jury instruction:

"One may recover for emotional distress which is directly related to the actual physical injury suffered by that person. Emotional distress which is not caused by some physical injury is not compensable."

---

[9] *Mink* uses the term "physical injury" rather than "physical harm." Although the terms should not be used interchangeably, *see infra,* 74 Or App 121, the court was not concerned with the precise definition of "physical harm."

[10] Because we have ruled that the court should have directed a verdict against Brad, it is not necessary to consider Perfected Pets' assignment of error number four asserting that the court erred when it denied Perfected Pets' pretrial motion for an order dismissing Brad's claim for failure to state a claim.

The court did not err in refusing to give this instruction. ORS 30.920 refers to "physical harm" and not "physical injury." The terms are not interchangeable. *See Restatement (Second) of Torts,* § 7, *comments a* and *b* (1965). Moreover, at the time the instruction was given, the claims of plaintiffs Sease and Nelson, which included breach of warranty, were submitted to the jury. Perfected Pets did not ask that its requested jury instruction be limited only to the strict liability claims of plaintiffs. Under some circumstances, emotional distress damages may be recovered in an action for breach of warranty without a showing of accompanying physical harm. *See Wells v. Oldsmobile Co.,* 147 Or 687, 35 P2d 232 (1934) (damages for "personal injuries" may be recovered in actions for breach of warranty); *Restatement (Second) Contracts,* § 353 (1981) (emotional distress damages in an action for breach of contract recoverable absent physical harm if "breach is of such a kind that serious emotional disturbance was a particularly likely result"). The court properly rejected the proposed instruction.

Perfected Pets also assigns as error that the court failed to give this jury instruction:

> "A plaintiff may recover only those damages which are a direct, reasonably foreseeable consequence of the defendant's action. Recovery for emotional distress is not allowed when the distress is unreasonable or where it results from a plaintiff's failure to make reasonable inquiry to learn facts which would reduce or eliminate the distress."

Perfected Pets submits no authority in support of the proposed jury instruction. The trial court did instruct the jury, without objection, "that a person who suffers damage has a duty to exercise reasonable care to avoid increasing that damage. There can be no recovery for increased damage caused by the failure to exercise such care." The trial court also instructed the jury that the law requires "that the compensation allowed be reasonable." Failure to give the instruction was not error. Accordingly, Perfected Pets' assignments of error as to Paula Hill and Nora Thayer are without merit.[11]

---

[11] We do not deal with defendant Perfected Pets' assignment of error number 11 because that defendant limited its supporting argument in its brief on appeal to the breach of warranty claims of Janice Sease, Shirley Sease and Betty Nelson, who have settled their claims.

Judgments of Nora Thayer and Paula Hill affirmed; judgment for D. Bradford Hill reversed.